# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### July 13, 2016 Session

## TENNESSEE COMMERCIAL ROE FISHERMEN'S ASSOCIATION, ET AL. v. TENNESSEE WILDLIFE RESOURCES COMMISSION, ET AL.

### Appeal from the Chancery Court for Davidson County
#### No. 081252IV     Russell T. Perkins, Chancellor

_____

### No. M2015-01944-COA-R3-CV – Filed August 30, 2016

_____

This lawsuit was brought by two associations of commercial fishermen challenging proclamations enacted by the Tennessee Wildlife Resources Commission ("TWRC") that affect, among other matters, the species and sizes of fish that may be harvested, the types of equipment that may be used, the permissible locations for fishing, and fishing seasons. On appeal, the fishermen argue that the proclamations are invalid because the actions of the TWRC violated the Open Meetings Act and procedural due process, because the proclamations violate substantive due process, and because one of the commissioners had an impermissible conflict of interest. We find no merit to the fishermen's arguments and, therefore, affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD R. DINKINS, J., joined.

James Robert McKoon, Blake F. Murchison, John R. Hegeman, and Kathryn Fairchild MacGregor, Chattanooga, Tennessee, for the appellants, Tennessee Commercial Fishermen's Association and Tennessee Commercial Roe Fishermen's Association.

Herbert H. Slatery, III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; and Elizabeth Parker McCarter, Senior Counsel, Nashville, Tennessee, for the appellees, Tennessee Wildlife Resources Commission, et al.

# OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

### Parties

Two trade organizations for commercial fishermen, Tennessee Commercial Roe Fishermen's Association and Tennessee Commercial Fishermen's Association (collectively, "the Fishermen" or "the plaintiffs"), filed suit against the TWRC, the executive director of the Tennessee Wildlife Resources Agency ("TWRA"), the governor as an ex officio member of the TWRC, and the TWRC commissioners (collectively, "the defendants"), challenging three wildlife proclamations adopted by the TWRC.[1] Pursuant to Tenn. Code Ann. § 70-1-206(a) (2011),[2] the TWRC performs the following functions:

> (1) Appoint and dismiss the executive director [of the TWRA];
> (2) Approve the budget pursuant to § 70-1-306;
> (3) Promulgate necessary rules, regulations, *and proclamations* as required under this title and title 69, chapter 9. . . .
> (4) Establish objectives within the state policy that will enable the wildlife resources agency to develop, manage and maintain sound programs of hunting, fishing, trapping and other wildlife related outdoor recreational activities;
> (5) Establish the salary of the executive director of the wildlife resources agency;
> (6) Promulgate rules and regulations for the administration of the Reelfoot Lake natural area, as provided in title 11, chapter 14, part 1; and
> (7) Promulgate rules and regulations to adjust fees for licenses and permits in this title and to establish new hunting, fishing and trapping licenses and permits as deemed appropriate along with necessary fees. . . .

(Emphasis added). The TWRA carries out the policies and objectives identified by the TWRC and acts to "[p]rotect, propagate, increase, preserve and conserve the wildlife of this state, and enforce by proper action and proceedings, the existing laws of this state relating to wildlife." Tenn. Code Ann. § 70-1-302(a)(2)(2011).

---

[1] The Fishermen initially filed suit against the TWRA, but that suit was dismissed by the trial court because the TWRA was not the agency that adopted the proclamations.

[2] Tennessee Code Annotated section 70-1-206 was amended effective June 30, 2012, 2012 PUB. ACTS CH. 993, § 1, to create the Tennessee Fish and Wildlife Commission. The Tennessee Fish and Wildlife Commission is the successor to the TWRC. Tenn. Code Ann. § 70-1-208.

<u>Proclamations</u>

Three TWRC proclamations[3] are at issue. Proclamation 08-01, which took effect on April 18, 2008, made numerous changes to commercial fishing regulations. The Fishermen focus on the following changes in their amended complaint:

a) The closure of Watts Bar Reservoir, Clinch River, Emory River, and Loosahatchie River to commercial fishing;[4]
b) A prohibition of the use of fyke nets on Cherokee Reservoir, Douglas Reservoir, and Old Hickory Reservoir;
c) A change of the closing date for commercial harvest of paddlefish on the Mississippi River from April 16 to April 1;
d) Notice that the minimum length for commercially harvested paddlefish would change from the previous 36" to 37" on April 8, 2008 and to 38" after November 15, 2009;
e) A requirement that a 2" portion of ovary (including some eggs) must remain attached to each harvested paddlefish until the fish is received by a licensed wholesale roe fish dealer, as opposed to the previous requirement that it remain attached while on or adjacent to the water where the fish was harvested;
f) A requirement that all species be removed from any commercial fishing gear each time the fisherman checks the net;
g) A change in the legal minimum block length for 40" paddlefish from 29.5" to 30";
h) A change in the definition of a "fish seine," limiting the length of such a net to 50', and altering the legal mesh size from the previous 3" or larger on the square to one-quarter (1/4) inch to one-half (1/2) inch on the square;
i) A requirement that commercial fishers and wholesale fish dealers must keep a valid phone number and street address on file with TWRA at all times;
j) The closure of the Mississippi River to commercial fishing from the Mississippi-Tennessee line upstream to Mississippi River Mile 745;[5]

---

[3] The Fishermen challenge Proclamations 08-01, 08-16, and 08-18.

[4] The Loosahatchie River was closed by a previous proclamation, but this is the first time that the plaintiffs have challenged the closure.

[5] Like the Loosahatchie, the Mississippi River upstream of the Mississippi-Tennessee border to Mile Marker 745 was closed by a previous proclamation, but Plaintiffs now challenge such closure.

k) A requirement that fish or turtles (or parts thereof) imported into the state must be reported to TWRA in the same manner as those harvested within the state.

(Footnotes in complaint).

## The complaint

According to their amended complaint,[6] the Fishermen "petitioned TWRA for a declaratory order regarding the validity and enforceability of Wildlife Proclamation 08-01" on April 7, 2008. The TWRA summarily denied this petition on April 16, 2008, and the Fishermen filed suit against the TWRA. At its September 2008 meeting, the TWRC enacted Proclamation 08-16, which took effect on November 7, 2008, and amended Proclamation 08-01. As described in the complaint, "[t]his amendment eliminated all restrictions on season and size regarding the commercial harvest of paddlefish, such that paddlefish were subject to a year round open harvest season." The Fishermen allege that the purpose of this amendment was to punish them for filing their lawsuit "by making their most profitable product unmarketable for lack of protection of the species." The United States Fish and Wildlife Service urged TWRC to reconsider Proclamation 08-16 "on the grounds that it jeopardized export of paddlefish roe from Tennessee, and potentially on a nationwide basis."

The amended complaint further states that, on October 28, 2008, the Fishermen filed a petition for declaratory order with the TWRC regarding the legality of Proclamation 08-16. At its November 2008 meeting, the TWRC passed Proclamation 08-18, "which reinstated the size and season limits on the commercial harvest of paddlefish to those originally enacted in Wildlife Proclamation 06-22 with the removal of dates for lengthening the size limits for paddlefish."

The Fishermen assert, in pertinent part, that the proclamations are invalid because one of the TWRC commissioners had impermissible conflicts of interest; the TWRC violated the Open Meetings Act and procedural due process; and the proclamations violate substantive due process.

---

[6] The Fishermen's original complaint (against TWRA) was filed on June 6, 2008. That complaint was dismissed because TWRA was not the proper defendant. The Fishermen's first amended complaint, filed with permission of the court, was filed on July 20, 2009. The second amended complaint, at issue here, was filed on December 7, 2009.

The matter ultimately proceeded to a bench trial held over three days in January and February 2011. Alan Fine, treasurer of the Tennessee Commercial Roe Fisherman's Association, one of the two plaintiff trade organizations and a commercial roe fisherman, was the first witness for the plaintiffs. He fished for paddlefish, which he described as filter feeders that eat mainly plankton and swim at all depths. Mr. Fine stated that fishermen use nets to fish for paddlefish. The most valuable part of the paddlefish was the roe (or fish eggs), but there was also a market for the flesh of the fish. Mr. Fine testified that TWRC proclamations affected his fishing business because they "dictate how I can operate, where I'm allowed to fish, what type of gear I'm allowed to fish." At the time of the hearing, the season for paddlefish was from November 15 through April 15. During the eleven years that Mr. Fine had been fishing for paddlefish, the season had changed three times. The legal size of paddlefish that fishermen could catch had also changed over those years. Mr. Fine also testified that he could no longer fish at Watts Bar due to the TWRC proclamations. He could not use fyke nets that he had built to fish at Old Hickory because these nets were no longer legal there.

Asked how he received notice from the TWRC of an upcoming hearing or proclamation, Mr. Fine testified that he might hear through a fisherman who knew a commissioner, other fishermen, a fish house, or from the TWRA website, which announced the date, time and location of the next TWRC meeting. According to Mr. Fine, the TWRA website usually added general information about the subject matter of the TWRC meeting a week to two weeks before the meeting. This did not include a copy of a draft proclamation or an agenda of the meeting. There was no consistency regarding the notice given: "There's times there's better notice and there's time[s] there's absolutely no notice and there's times that there's some notice." For example, Mr. Fine said that Proclamation 08-16 was brought up at a meeting he attended because there was to be a discussion regarding commercial fishing on the Mississippi River. He had received no notice that the opening or closing of the paddlefish season was to be discussed; yet Proclamation 08-16 was brought up, voted on, and passed at the meeting. There was no opportunity for comment. With respect to Proclamation 08-01, Mr. Fine stated that his organization had contacted Mr. Fox, an employee of the TWRA, and obtained a copy three days prior to the meeting. That was the first and only time he had ever received a draft proclamation before a meeting.

Mr. Fine testified that he had incurred economic damage as a result of the three challenged proclamations. He spent approximately $8000 to build fishing gear, namely a fyke net and a fish seine, to comply with the existing proclamations. Under the new rules enacted in the challenged proclamations, Mr. Fine could no longer use the fish seines or the fyke nets.

James Dale Roberson, a member of the Tennessee Commercial Fishermen's Association, the other plaintiff, and a commercial roe fisherman, testified that he generally knew when the TWRC was meeting and what was on the agenda because they had "certain months that they do certain things." Mr. Roberson acknowledged on cross-examination that he attended the January 2008 TWRC meeting when Proclamation 08-01 was discussed as well as a TWRC meeting in the summer of 2007 at which the commission discussed changing the regulations for "fyke net fish seines." Mr. Roberson also attended meetings in West Tennessee in the summer of 2007 put on by the TWRA for commercial fishermen; Biologist Reggie Wiggins presided over these meetings. At these meetings in the summer of 2007, commercial fishermen were permitted to voice their concerns about recommended changes, many of which would become part of Proclamation 08-01. Mr. Roberson testified that the only person to whom he sold paddlefish roe for export was Mr. Fine. At present, he was selling caviar only domestically "because of the downturn in the economy in the last three or four years," not as a result of TWRC's proclamations.

As to the notice issue, Mr. Roberson stated that he learned about TWRC meetings mostly by word of mouth from other fishermen. He did not know what was on the agenda at a particular meeting. Mr. Roberson was at a meeting on issues regarding sturgeon and at the meeting when Proclamation 08-01 was passed.

The next witness was Steve Nifong, assistant chief of law enforcement for the TWRA, who testified that violations of proclamations could be criminally enforced. The TWRA wildlife officers were charged with enforcing the proclamations; violation of these proclamations was a Class B misdemeanor, which carried a penalty of up to $500 and up to six months in jail. A provision of the Tennessee Code also allowed "judges to declare as contraband any equipment that is used in violation of any regulation." Mr. Nifong was aware of cases in which commercial fishermen had their gear and equipment (including boats) seized; with respect to sport fisherman, he knew of cases in which their gear, such as fishing poles, had been seized, but not their boats.

Gregory Denton was the next witness to testify. Mr. Denton worked for the Department of Environment and Conservation ("TDEC") as an environmental manager. His responsibilities included the development of water quality standards and recommendations for the issuance of contaminant advisories, the latter being in the form of notifications to interested agencies (including the TWRA), postings on the TDEC website, and postings at affected waters of unhealthy levels of contaminants in fish or water. Mr. Denton testified that TDEC switched from using the Food and Drug Administration ("FDA") guidelines to the Environmental Protection Agency ("EPA") guidelines when the EPA began providing written guidance for states on issuing advisories.

Asked about a chart comparing FDA and EPA action levels, Mr. Denton stated that "the action level for the FDA is higher than it is for the EPA." Mr. Denton explained that the FDA had to consider other factors than just the health effects, such as the economic effects, whereas the EPA considered only the health effects. Moreover, in issuing its fishing advisory, the EPA wanted to protect recreational fishermen and subsistence fishermen, people who depend on fishing the waterway as a source of food. The FDA's concerns were interstate commerce and food or medicine—"fishing that reaches the commercial marketplace."

Mr. Denton testified that TDEC had issued a contaminant advisory for mercury for the Emory River in 2007 and the advisory remained in effect. This was a precautionary advisory[7] based upon the EPA levels. Mr. Denton's agency had issued contaminant advisories for parts of Watts Bar until around 1990 or 1991, when the entire reservoir was included. The official contaminant was PCBs, but there was only concern about chlordane. Mr. Denton stated that "[t]he Watts Bar advisories all predated our adoption of the EPA guidance." The EPA levels were adopted in the late 1990s. According to Mr. Denton, three agencies monitored fish tissue in Watts Bar. His agency had reevaluated the data under the new guidelines, and the 2008 contaminant advisory was based upon the EPA levels. The fish implicated in the contaminant advisory differed slightly depending upon the part of the lake. Paddlefish were not included on the list. The Tennessee Department of Environment and Conservation had not tested paddlefish, but Mr. Denton believed they had been tested before by the TWRA.

At this point in the hearing, the plaintiffs introduced into evidence portions of the deposition of Commissioner Mitchell Parks.[8] In response, the defendants designated certain portions of the deposition to be admitted into evidence. The relevant portions of Commissioner Parks's deposition testimony will be summarized in the analysis section below.

Trevor Kenchington, Ph.D., testified as an expert witness for the Fishermen. At the Fishermen's request, he had reviewed a 2005 report by Bettoli and Scholten ("the Bettoli report") relied upon by the TWRA in making its recommendations to the TWRC. He testified that a "stock assessment" is scientific advice focused upon "the effect of pollutants on the fish and the effect of the numbers of the fish on the fishery." Asked whether he considered the Bettoli report a stock assessment, Dr. Kenchington noted that the report lacked several key elements: "consideration of the change over time in catches

---

[7] Mr. Denton testified that a precautionary advisory "is the level at which we suggest that pregnant women or nursing mothers or children not eat any of the fish, sensitive groups, and then the general population simply limit the consumption to a certain number of meals per month."

[8] The plaintiffs requested that the defendants name a designee to speak for the TWRC regarding issues of notice pursuant to Tenn. R. Civ. P. 30.06(6), and the defendants named Commissioner Parks.

or fishing efforts, which are the roots of the fishing impact on the resource" and "an estimate of the fishing mortality rate." He stated that the latter is "the standard way of measuring the proportion of the resource that is being taken by the fishery in a given year." This information was necessary in order to determine whether there was overfishing.

Dr. Kenchington questioned whether the sampling in the Bettoli report was conducted in a way that produced representative samples. He could not make that determination based upon his reading of the report. Dr. Kenchington further discussed his concerns regarding the methods used to gather data in the studies referenced in the report. He found the total mortality rate of $1.126$[9] in the Bettoli report to be exceptionally high; at this rate, "the Kentucky Lake paddlefish resource is in deep trouble." He discussed other concerns with these results, including the problems inherent in determining the ages of paddlefish, a step in accurately determining the mortality rate. Dr. Kenchington observed that Dr. Bettoli had not validated the readings of the paddlefish, which was generally considered necessary for accurate fish aging.

Dr. Kenchington also disputed the recommendations of the Bettoli report. He pointed out that there can be two main approaches to addressing a high fishing mortality rate: managing the fishing and managing the environment. The Bettoli report was oriented towards the former. Dr. Kenchington was surprised that the report did not address controlling the environment to make it more suitable for paddlefish. Overall, he did not consider the Bettoli report reliable, although certain studies in the report seemed valid to him. Dr. Kenchington opined that "[t]here is nothing here to suggest the [paddlefish] population is going down."

The next witness for the plaintiffs was Lonnie Collier, a commercial fisherman and a member of the Tennessee Commercial Roe Fisherman's Association since about 2007. Mr. Collier fished mostly for paddlefish. Prior to the closure of Watts Bar in 2008, he had fished mainly at Watts Bar; since that time, he had been trying different rivers, but had not found a satisfactory place. Mr. Collier had been a commercial fisherman for more than thirty years. He estimated that he made $30,000 to $40,000 as a commercial fisherman in 2006, approximately $70,000 in 2007, and approximately $90,000 in 2008. After the closure of Watts Bar, Mr. Collier made about $6,000 in 2009. He tried to fish other areas, but his efforts were not successful.

Commissioner Chase was called as an adverse witness by the plaintiffs and was then called as the defendants' first witness. Commissioner Chase was a member of the

---

[9] Dr. Kenchington explained that this is an exponential rate, which allows the number to go above 100 percent.

TWRC in 2008 and voted in favor of Proclamation 08-01 in January 2008. His testimony will be outlined below in the section on conflicts of interest.

The defendants' next witness was James Fox, a former employee of the TWRA who retired in October 2009. Mr. Fox testified that, at the time of his retirement, he was the assistant director, one step below the executive director, and had held that position for twenty-three years. As assistant director, Mr. Fox attended all TWRC meetings. He testified that the commission met monthly with the exception of December. Asked to describe TWRA's role in preparing for TWRC meetings, Mr. Fox testified:

> A. The agency would, of course, announce the upcoming dates of commission meetings that were established by the commission at the prior meeting. We would start a process of preparing recommendations for the development of things to take to the commission at the later meeting. We would go through a recommendation process and staff meetings and things of that type. And then we'd start the process of preparing documents to send to the commission and send those commissioners, try to get those documents to them in a timely fashion prior to the next meeting.
> . . .
> Q. Now, you said documents were sent to the commission. What kinds of materials or documents were typically provided to the commission in advance of a meeting?
> A. In advance of the meeting, there would be documents that would be, of course, an agenda that would be prepared in advance; there would be a letter containing descriptions of the items that they might have before them; and there would be documents such as background information and proclamations and rules that might be before the commission at their upcoming meeting.
> Q. Would the agenda be available to the public?
> A. The agenda—the minute the agenda was prepared and ready to go to the commission, that agenda would be disseminated through our information division to the public.
> . . .
> Q. Can you describe for the Court how the agency used field orders or field requests for commercial fishing proclamations during your tenure?
> A. In the case of commercial fishing proclamations, it was a process of, the first thing we would do is solicit comments from the public. That process would start six to eight months prior to any action being taken. There was an orderly process of development of reviewing the data that pertained to that particular program. That data would be reviewed. Our biologists would meet and develop some potential changes in regulations. Those would be staffed through a process there at our office, and the final product would be developed that would represent the agency's biological

recommendations. Those recommendations in the case of commercial fishing would normally be shared at an earlier meeting with the commission and the public to let them know what the agency was going to consider later in the year, and then there would be another two- or three-month period where those would be reviewed, and a final proclamation would eventually be developed and presented to the commission.[10]

The defendants' attorney then questioned Mr. Fox about the meeting that occurred in January 2008 at which Proclamation 08-01 was passed by the TWRC. Mr. Fox testified that Jim McKoon, the Fishermen's attorney, contacted him prior to that meeting requesting a draft of the proposed proclamation and Mr. Fox provided him with that document. Mr. Fox testified about the process that led up to the January 2008 TWRC meeting:

A. Some of that started with the initial field request, which is that process I explained earlier. But in the latter stages of that field request process, there's a point where you carry the initial recommendations to the commission, and that was done at Paris Landing. At the Paris Landing commission meeting it was discussed at length, and there were individuals there who posed questions. And the commission requested that we review those questions that were brought about by – from members of the commercial fishing folks who were there and look at those and then develop responses to the questions they had posed.
Q. Do you recall what month the Paris [Landing] commission meeting was, month and year?
A. It was earlier this year. It would have been, I think, in September of 2007.
Q. Did Mr. McKoon speak at that meeting or any other commission meetings?
A. Yes, Mr. McKoon.
Q. That year?
A. As a matter of fact, a number of the questions that we addressed later were questions that he had posed at that meeting.
Q. Was he allowed to make any presentations to the commission?
A. Yes. He made a presentation, rather lengthy presentation to the commission.
Q. Lengthy? What do you mean by "lengthy"?

---

[10] The defendants entered into evidence the six- to eight-month TWRA protocol for presenting proclamations to the commission in 2008. The court determined that the protocol would be accorded "marginal relevance" because the defendants did not have the protocol applicable in 2007, when the January 2008 proclamation would have been under consideration by the TWRA.

A. Probably an hour. I don't know for sure. But it was lengthy.

Q. Okay. What were the topics of his presentation?

A. His topics, as I recall, were—were issues that were in that proclamation that he or his class had issues with that would be further discussed.

Q. Did you ever have an occasion to meet personally with Mr. McKoon on the issues related to commercial fishing in 2007?

A. Yes, I did.

Q. When was that, if you recall.

A. Following that meeting, the commission specifically instructed that we meet with Mr. McKoon and try to resolve those issues he opposed, and I was in contact with Mr. McKoon. And we established a meeting in Nashville in October and—

Q. Of what year?

A. October 2007, to discuss these points that he had brought out at the meeting at Paris [Landing].

Q. And what was the result of that meeting?

A. As I recall, we resolved a number of the issues that were on the sheet. I think there were about maybe twelve or fifteen. And we met at our facility here in Nashville and addressed each one of those. And several of the things we resolved, I think, to his satisfaction. And we agreed there were a few things that were still at issue, but at the end of the day, I think he felt like we had addressed most of them.

Carol Jane King Smith, executive administrative assistant to the director of the TWRA and a forty-five-year employee of the agency, testified that her responsibilities included attending the meetings, keeping the minutes of the TWRC meetings, and acting as the custodian of the sign-in sheets for all of the commission meetings. Following a commission meeting, Ms. Smith would notify about sixty-five TWRA staff members and commissioners of the next meeting or meetings. The recipients would include the chief of information and education, currently Don King, and the web developers. Ms. Smith testified that she had been emailing these notifications since the mid-1990s.

Ms. Smith stated that, when the TWRC met, it customarily met over two days. The first day would be devoted to committee meetings, and the second day would be for the full commission meeting. The defendants introduced into evidence the minutes from various TWRC meetings from September 28, 2006 through November 4, 2008, including the January 2008 meeting. They also introduced into evidence attendance sheets from these meetings. Ms. Smith testified that she recognized the names of many commercial fishermen on the sign-in sheets, and some stated their affiliation as commercial fisherman beside their names. Jim McKoon's name appeared on the sign-in sheet for the September 19, 2007 meeting.

Donald Alan King, TWRA chief of information and education division, testified that his division was in charge of the dissemination of public information, including information about upcoming commission meetings. Information about upcoming meetings was posted on the TWRA website. His division also provided the personnel and equipment for the audio and video recordings of the TWRC meetings. Asked how his office prepares for a commission meeting, Mr. King explained:

A. [A]s the agenda items are put together in the director's office, those are forwarded to me and my staff, who place those in the proper places on our website, prepare a news release that goes out as a preview to the meeting with the complete rundown of the agenda items that will be expected to be discussed and, of course, the locations and times of the meetings so that the public is invited to attend all our public meeting, of course. And so those are distributed on our website and also distributed to various outlets of the news media, including radio stations, television stations, print media, and electronic media across the state.

Q. Generally, how much in advance of a meeting would you provide notice of the dates?

A. We try to do it as far out as two weeks prior. Sometimes the information is not available quite that early, so I would say the normal time frame would be ten days to within a week of a commission meeting.

Q. What about the agency for an upcoming meeting? How soon would that go on the website?

A. That would be placed on the website ten days prior to the—to the meeting under normal circumstances.

Q. On your website, is there a tab where you can access news about the commission?

A. Yes. . . .

Q. And was that tab on the website in January of 2008 and throughout 2008?

A. Yes.

Q. Was it on the website in 2007?

A. Yes.

Defense counsel then questioned Mr. King about a meeting agenda from the two-day TWRC meeting at Reelfoot Lake State Park in January 2008. The first day was for committee meetings; the second day, the full commission met. Each of the agendas reflected that Proclamation 08-01 was under consideration. Mr. King was then asked what type of information his office would distribute to news outlets about upcoming TWRC meetings. He stated that they would do a synopsis of the items on the agenda, "making special note of things that we feel the public would be interested in, and we prioritize that within the news release we develop." The defendants introduced into evidence a news release regarding the January 2008 meeting at Reelfoot Lake. Mr. King

- 12 -

estimated that this news release was sent to about a hundred news outlets. On cross-examination, Mr. King stated that he did not have a copy of the page on the website where the January 2008 meeting had been posted.

Reggie Wiggins, a wildlife biologist employed by the TWRA in West Tennessee, testified that he was responsible for fish data collection. He coordinated three meetings with commercial fishermen in his region in the summer of 2007 to discuss the proposed proclamation. Law enforcement personnel and fisheries personnel were also present at these meetings. The sign-in sheets from these three meetings were admitted into evidence. Mr. Wiggins stated that mostly commercial fishermen attended the meetings, and there was a TWRA employee who took notes. He provided the attendees with a list of the proposed changes to the commercial fishing proclamations. Comments from the attendees were received after the meeting; these were admitted into evidence. Mr. Wiggins further testified that, in the summer of 2007, he chaired a meeting with commercial fishermen in Nashville in place of George Scholten.[11] Also in attendance at that meeting were TWRA personnel, Dr. Bettoli, and some representatives from the United States Fish and Wildlife Service. Mr. Wiggins made a presentation concerning the 2006-2007 paddlefish harvest. Someone else reviewed the proposed changes to the commercial fishing proclamations.

George Daniel Scholten, a co-author of the Bettoli report, testified for the defendants. He had worked for the TWRA for five years and had played a role in drafting Proclamation 08-01. Mr. Scholten testified about the process the agency went through to prepare a proclamation to present to the TWRC and gave the following testimony concerning the reasoning of the TWRC in closing Watts Bar in Proclamation 08-01:

> A. The agency recommended closure of Watts Bar, because . . . on July 1 of 2005, we implemented a new harvest reporting system. The system very accurately tracked the harvest. And we determined or we found out that catfish harvest in Watts Bar was much higher than we previously expected . . . before based on the contaminant advisory. There was very little catfish harvest in Watts Bar reservoir. And that turned out not to be the case. It was in excess of 100,000 pounds per year. So that was alarming, because we had 100,000 of contaminated fish going to unsuspecting consumers. So we decided to recommend closure of Watts Bar, because it also had—Watts Bar already had an existing containment [sic] ban. And that prevented the harvest of most other species.
> A. Okay. What else besides the harvest reporting system and the entanglement gear ban?

---

[11] The date of this meeting was July 26, 2007.

- 13 -

Q. Well, with those—those two, with the entanglement gear ban and the—the threat of contaminated catfish entering the market, there was also a law enforcement concern that if they saw somebody out there collecting fish [they] wouldn't know if they were collecting catfish, they would eventually enter the market, or if they would be collecting one of the other species that's not collected as efficiently as it is with entanglement gear, which they could legally still have collected those fish with that—that gear.

Q. And what was the basis for your fear about contaminated fish?

A. There was an advisory from the Tennessee Department of Environment and Conservation about catfish in Watts Bar Reservoir. And typically when we get an advisory for a commercial species from TDEC, we recommend closure of that fishery, because these fish are going to unsuspecting consumers, and they don't get a choice to make like a sport fisherman would, whether or not they could eat a contaminated fish. . . .

Q. Did the ban on entanglement gear predate your employment with the wildlife agency?

A. Yes. I believe it was implemented in 1980.

. . .

Q. Are gill nets and trammel nets [two main types of entanglement gear] customarily used by paddlefish fishermen?

A. Yes. That's almost exclusively what they use.

Q. Why would the agency not just recommend to the commission that they close Watts Bar to the fishing—commercial fishing of catfish alone?

A. Like I said, we would have the catfish ban in place, the existing entanglement gear ban, the law enforcement concerns with keeping it open. And with their concern that we were to keep it open for those few other species that can still maybe be harvested with some of these other gear types, there would be cost associated with that enforcement. And the benefits that commercial fishermen would realize from keeping those other fisheries open would be minimal at best. . . . Because . . . paddlefish and buffalo are two other main species that would be harvested from Watts Bar reservoir. They're harvested with entanglement gear. . . . And they could use some of these other gears to catch those species but not in an efficient manner and not in the manner which they were traditionally fished.

Mr. Scholten testified that TWRA recommended the closure of the Loosahatchie River to commercial fishing because there was a contaminant advisory issued by TDEC for all fish species. He explained the basis for some of the other changes in the agency prohibitions.

Asked about the Bettoli report, Mr. Scholten testified that the study was commissioned by the United States Fish and Wildlife Service to conduct an assessment of the Kentucky Lake paddlefish fishery. Mr. Scholten worked on the study as a research

assistant as part of his master's of science program; he worked under Dr. Bettoli, who was teaching at Tennessee Technological University but was an employee of the United States Geological Survey. The study began in the fall of 2002 and the field work ended in the spring of 2004. Mr. Scholten testified that, historically, paddlefish were native to twenty-eight states within the Mississippi River basin. For a period of time, paddlefish populations have been in decline; in six states, they have essentially disappeared. Mr. Scholten stated that, "of the 22 states that still have paddlefish populations, twelve of them closed their commercial fisheries because of the declines that were documented over—between the early 1900s and the late . . . or mid 1990s." At the time of the hearing, there were seven states, including Tennessee, that allowed commercial fishing of paddlefish. The main reasons for the closing of paddlefish fisheries were overfishing and habitat loss; the latter occurred mainly due to the building of dams.

Mr. Schloten explained that paddlefish were subject to certain federal regulations because they are listed under the Convention on International Trade in Endangered Species ("CITES"). Paddlefish are listed under Appendix 2, which means that the species could easily become endangered if not closely managed. The United States Fish and Wildlife Service is charged with administering the CITES program. Until 2008, Tennessee was the leading exporter of paddlefish roe to Europe; Kentucky Lake in particular was one of the largest sources of paddlefish caviar in the world.

So, the Bettoli study was conducted on Kentucky Lake. According to Mr. Schloten, fishermen generally use gill nets to catch paddlefish on Kentucky Lake. Mr. Schloten explained the methods used for the study, and he gave detailed testimony about the researchers' discussions with fishermen and their efforts to make sure that they were aware of all of the relevant factors affecting the fish harvest. He explained their documentation of the size and age structure of the paddlefish in Kentucky Lake, stating that this was one of their main objectives. They used dentary bone to age the paddlefish. Mr. Scholten concluded that, "The size structure and age structure represented a population that was being extremely overfished, because we saw truncated size structure, truncated age structure." Based upon the age structure, the study concluded that mortality of the paddlefish was very high: sixty-nine percent. At the same time as the Bettoli study, TWRA was collecting field work and data on its own, and that agency came up with an estimated mortality of over sixty percent. Mr. Scholten considered the report's mortality rate of sixty-nine percent reasonable in light of similar findings in other states and previous studies on Kentucky Lake.

Mr. Schloten testified that, after he started working for the TWRA, he participated in drafting Proclamation 5-22, which incorporated a plan (based on the Bettoli report) for gradually increasing acceptable paddlefish size and truncating the season on Kentucky Lake. Mr. Schloten testified that the Bettoli study was peer-reviewed.

The plaintiffs recalled Dr. Kenchington as a rebuttal witness. After hearing Mr. Schloten's testimony, he did not change his conclusions regarding the Bettoli report.

Trial court decision

The trial court entered a memorandum and final order on May 14, 2015.[12] In its order, the trial court addressed and rejected each of the Fishermen's arguments, dismissed their complaint, and entered judgment in favor of the defendants. (We will consider the trial court's reasoning as relevant below concerning the issues on appeal.)

The Fishermen filed a motion to alter or amend the final order. The trial court denied this motion to alter or amend on August 25, 2015, and this appeal followed.

Issues on appeal

The Fishermen argue on appeal that: (1) the actions of the TWRC violated the Open Meetings Act and procedural due process; (2) the proclamations violate substantive due process; and (3) the vote of Commissioner Chase was improper with the result that Proclamation 08-01 was void *ab initio*.

STANDARD OF REVIEW

In a civil case tried without a jury, we review the trial court's findings of fact de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. TENN. R. APP. P. 13(d). We review questions of law de novo with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628-29 (Tenn. 1999).

ANALYSIS

Open Meetings Act/Procedural Due Process

The plaintiffs assert that the actions of the defendants in passing the proclamations at issue did not comply with the Open Meetings Act or procedural due process.

We begin by addressing the Fishermen's assertion that the trial court erred in considering the conduct of the TWRA and the TWRC together in determining whether

---

[12] After filing three motions to render decision with the trial court and having no decision rendered, the defendants submitted a motion to render decision to the Supreme Court pursuant to Tenn. Sup. Ct. R. 11(III)(c). The Court filed an order on April 14, 2015 requiring the chancellor to render a decision "as soon as possible, but by no means later than thirty days from the date of filing of this order."

there was proper notice and whether the process leading up to the adoption of the proclamations violated procedural due process. The Fishermen emphasize that the TWRA was dismissed from this action as not being the proper defendant and characterize the trial court's consideration of the TWRA's conduct along with that of the TWRC as a "shell game." We cannot agree with this analysis. As set forth above, the statutory role of the executive director of the TWRA is to act as the recording secretary for the TWRC and to "perform such other duties as may be prescribed by the commission." Tenn. Code Ann. § 70-1-304(2), (4). The agency's overarching role is to protect and preserve wildlife in Tennessee. Tenn. Code Ann. § 70-1-302(a)(2). The undisputed testimony at trial was that the TWRA functions as the administrative arm of the TWRC, prepares notices and agendas for TWRC meetings, and drafts proclamations for the commission's approval. We conclude that the trial court acted properly in considering the actions of the TWRA and the TWRC together in analyzing the notice and procedural due process issues.

The Open Meetings Act ("OMA") provides that "[a]ll meetings of any governing body are declared to be public meetings open to the public at all times." Tenn. Code Ann. § 8-44-102(a). There is no dispute that the TWRA and the TWRC are governing bodies within the definition of the OMA. *See* Tenn. Code Ann. § 8-44-102(b)(1). With respect to notice, the OMA provides:

(a) NOTICE OF REGULAR MEETINGS. Any such governmental body which holds a meeting previously scheduled by statute, ordinance, or resolution shall give adequate public notice of such meeting.
(b) NOTICE OF SPECIAL MEETINGS. Any such governmental body which holds a meeting not previously scheduled by statute, ordinance, or resolution, or for which notice is not already provided by law, shall give adequate public notice of such meeting.

Tenn. Code Ann. § 8-44-103. The statute offers no further guidance as to what constitutes "adequate public notice" in the context of a regular or special meeting.

Statutes should be interpreted in accordance with the intent of the legislature, and that intent is primarily derived from the natural and ordinary meaning of the words used. *Harris v. Haynes*, 445 S.W.3d 143, 146 (Tenn. 2014). Both subsections of Tenn. Code Ann. § 8-44-103 require "adequate public notice of such meeting." The notice required is "of such meeting," not necessarily of the items to be discussed at "such meeting." *Fisher v. Rutherford Cnty. Reg'l Planning Comm'n*, No. M2012-01397-COA-R3-CV, 2013 WL 2382300, at *4 (Tenn. Ct. App. May 29, 2013). In *Memphis Publishing Company v. City of Memphis*, 513 S.W.2d 511 (Tenn. 1974), our Supreme Court adopted the following test for determining what constitutes adequate public notice: "[A]dequate public notice means adequate public notice under the circumstances, or such notice based on the totality of the circumstances as would fairly inform the public." *Memphis Publ'g*, 513 S.W.2d at 513.

There are other cases providing guidance regarding the contents of adequate public notice. In *Souder v. Health Partners, Inc.*, 997 S.W.2d 140 (Tenn. Ct. App. 1998), a physician filed suit against a preferred provider organization (PPO) claiming that the PPO violated the OMA in its termination of a physician participation agreement. The following notice of the board of trustees meeting was provided to the local newspaper, radio stations, and TV station eight days prior to the meeting: "The board of trustees of West Tennessee Healthcare will meet in the city-county conference of Jackson-Madison County General Hospital at 5:00 p.m. on Tuesday, _____." *Souder*, 997 S.W.2d at 150. The plaintiff argued that the notice was inadequate because there was no mention of the meeting content or issues to be discussed. *Id.* at 149. In finding the notice to be adequate, the court reasoned as follows:

> In view of the totality of the circumstances, the notice of the meeting comports with the provisions of the Act. Notice was given to the media in order to notify the public of the meeting. The notice provided the public with a reasonable opportunity to be present at the meeting. In fact, according to the minutes of the meeting, members of the media and the public were in attendance at the meeting. Furthermore, while Souder protests the contents of the notice in not referring to the proposed action of limiting the physician network, the meeting was not limited to this sole subject. The agenda of the meeting presented several different areas regarding the business of the District. Thus, failing to specifically state in the notice the issue concerning HP did not make the notice inadequate in light of the several purposes of the meeting. We are of the opinion that notice was given which "would fairly inform the public" under the circumstances.

*Id.* at 150.

In *Fisher v. Rutherford County Regional Planning Commission*, 2013 WL 2382300, at *1, the issue was whether the county provided adequate notice regarding a planning commission meeting to vote on the site plan for a mosque. The planning commission meeting at issue was a regularly scheduled monthly meeting for matters requiring a public hearing. *Fisher*, 2013 WL 2382300, at *1, 3. Notice of such meetings was published in a free local weekly paper that ran legal notices and was distributed in driveways in the city and made available in racks at 300 locations. *Id.* at *6. The notice itself gave the location and time of the meeting; the notice and agenda were available at the planning department before the meeting. *Id.* at *4. The court considered whether, under the "totality of the circumstances," the notice provided by the county was sufficient to "'fairly inform the public.'" *Id.* at *6 (quoting *Memphis Publ'g,* 513 S.W.2d at 513). With respect to the content of the notice itself, the court concluded as follows:

In light of the available precedents and the language of the OMA itself, we conclude that the notice in this case was adequate. Tennessee Code Annotated section 8-44-103 requires notice of the meeting itself and does not speak to notice of the content of the meeting. Cases requiring notice of items to be discussed at a meeting have all involved special meetings. We decline to adopt the trial court's reasoning that issues of public importance require notice of meeting content, even for regular meetings. Such requirements have been imposed only with regard to special meetings. *See Englewood*, 1999 WL 419710, at *3; *Neese*, 813 S.W.2d at 435. In this case, the county provided notice of its regular meeting in the same manner used with respect to all other site plans. At that meeting, the planning commission considered a number of agenda items and voted on multiple issues.

*Id.* (footnotes omitted).[13]

Contrary to the reasoning employed by the Fishermen, the burden of proof was upon the plaintiffs, not the defendants, to establish that the notice provided for the TWRC meetings at which proclamations were passed was insufficient or that decisions were made in secret. *See* 126 AM. JUR. PROOF OF FACTS *Proof of Violation of State Open Meeting or Sunshine Law* § 11 (stating that "a party who asserts that a public body has violated the open-meetings laws generally has the burden of proving that assertion"); *see also Brenneman Bros. v. Allen Cnty. Comm'rs*, No. 1-14-15, 2015 WL 233576, at *4 (Ohio Ct. App. Jan. 20, 2015) (stating that "the party asserting a violation of [the Open Meetings Act] has the ultimate burden to prove [the Act] was violated (or was threatened to be violated) by a public body"); *Rogers v. City of McAllen*, No. 13-07-00278-CV, 2008 WL 3867679, at *3 (Tex. Ct. App. Aug. 21, 2008) (finding that the plaintiff bore the burden of proof "to show that the City's notice did not meet the requirements of the Open Meetings Act"). The Fishermen cite no authority for the theory that the burden was upon the defendants to prove that the notice they provided was sufficient.

Under the Tennessee caselaw summarized above, the adequacy of the notice provided for the January 2008 meeting at which Proclamation 08-01 was passed depends upon whether, under the totality of the circumstances, the notice "'gives interested citizens a reasonable opportunity to exercise their right to be present at a governing body's meeting.'" *Souder*, 997 S.W.2d at 150 (quoting *State ex rel. Akin v. Town of Kingston Springs*, No. 01-A-01-9209-CH00360, 1993 WL 339305, at *5 (Tenn. Ct. App. Sept. 8, 1993)). It is not necessary for the notice to "'invite public participation in a

---

[13] The court in *Fisher* also considered the adequacy of the publication and concluded that the county's publication in the weekly paper was sufficient under the OMA. *Fisher*, 2013 WL 2382300, at *7.

public meeting in order to satisfy the [OMA's] requirements.'" *Id.* (quoting *Akin*, 1993 WL 339305, at *5). Mr. King testified that his office provided notice, including an agenda, of TWRC meetings on the TWRA website and through press releases to approximately one hundred media outlets about seven to ten days before a commission meeting. The record includes an agenda from the January 16, 2008 TWRC committee meeting and the January 17, 2008 TWRC commission meeting as well as a copy of the TWRA press release concerning the January 16-17 TWRC meeting at Reelfoot Lake State Park. The press release includes the following statement:

> Recommended changes to the commercial fishing proclamation will be presented for commission approval. Presentations on sturgeon genetics and pallid sturgeon harvest will be made by Bernie Kuhajda, Molecular Ichthyologist, University of Alabama, and Phil Bettoli, Fisheries Research Scientist, Tennessee Tech University.

We consider this notice to be sufficient to provide the public with reasonable notice of the date, time and location of the meeting so as to give them the opportunity to be present.[14]

The Fishermen emphasize that Mr. King was not able to present evidence that the press releases were actually published or that the notice actually appeared on the TWRA website. Again, we must emphasize that the burden of proof is upon the Fishermen to prove that the notice was insufficient. There is evidence in the record that actual notice did occur: around a dozen commercial fishermen and their attorney, Mr. McKoon, attended the meetings in January 2008. Mr. Fox provided plaintiffs' counsel with an advance copy of Proclamation 08-01 two days before the January 2008 TWRC meeting. Moreover, Mr. Fine testified that he spoke in opposition to the proposed proclamation at the January 2008 commission meeting.[15]

We come now to the Fishermen's procedural due process argument. The plaintiffs do not flesh out this argument in their brief. When a procedural due process claim is asserted, a court must first determine whether the plaintiffs have an interest that is entitled to due process protection. *Heyne v. Metro. Nashville Bd. of Pub. Educ.*, 380 S.W.3d 715, 731 (Tenn. 2012). The plaintiffs must possess a constitutionally protected liberty or property interest. *Rowe v. Bd. of Educ. of City of Chattanooga*, 938 S.W.2d 351, 354 (Tenn. 1996). The plaintiffs have not established that a liberty or property

---

[14] Pursuant to Tenn. Code Ann. § 4-5-106(d), wildlife proclamations are not subject to the notice and hearing requirements of the Uniform Administrative Procedures Act ("UAPA").

[15] The plaintiffs do not address the other two proclamations with respect to notice in their appellate brief.

interest is implicated here. The trial court noted that at least one of the plaintiffs holds a "fishing license that was arguably diminished in commercial value based on the wildlife proclamation at issue." The trial court went on to find that "[t]his does not necessarily indicate an impingement of a protected liberty interest given that all of these licenses are accepted with the understanding that wildlife proclamations could impact the commercial value of these licenses." We recognize, however, that courts in other jurisdictions have found a liberty or property interest in using one's fishing license and/or fishing equipment. *See Burns Harbor Fish Co., Inc. v. Ralston*, 800 F. Supp. 722, 729 (S.D. Ind. 1992) (holding that plaintiff had "a protectible property interest in its fishing licenses"); *LaBauve v. La. Wildlife & Fisheries Comm'n*, 444 F. Supp. 1370, 1378-79 (E.D. La. 1978) (finding property interest "in exercising [one's] fishing license and using [one's] paraphernalia").

Even if we assume that some of the Fishermen possess a liberty or property interest, we find that they were afforded adequate notice and an opportunity to be heard during the process leading up the passage of the proclamations. As we have previously concluded, the TWRA handles the drafting and previewing of proposed proclamations. With respect to Proclamation 08-01, the preview process began in the summer of 2007. TWRA personnel met with commercial fishermen on three different dates at three different locations in July 2007 to present them with a list of proposed changes including mesh size for nets, the closing of certain waters due to contaminant advisories, and changing paddlefish regulations in the Mississippi River. The TWRA asked the fishermen to send written comments on the proposed comments, and the agency received numerous comments. The TWRA held a meeting in Nashville on July 26, 2007 to receive input from commercial roe fishermen on proposed proclamation changes.

Mr. Fox, former assistant director of TWRA, testified that counsel for the plaintiffs gave a lengthy presentation to the TWRC at the September 2007 meeting in opposition to many of the proposed proclamation changes. At the direction of the commission, Mr. Fox met with plaintiffs' counsel in October 2007 to try to resolve their issues with the proclamations. These facts, coupled with the facts summarized above regarding the January 2008 meeting and the TWRA's practices regarding notice, establish that the process used to pass Proclamation 08-01 did not violate procedural due process.[16]

---

[16] In their reply brief, the Fishermen briefly discuss the issue of whether Tenn. Code Ann. § 4-5-106, which exempts wildlife proclamations from the UAPA rulemaking requirements, fails to withstand constitutional scrutiny. This court has previously held that "a reply brief is a response to the arguments of the appellee, not a vehicle for raising new arguments." *Stovall v. UHS Lakeside, LLC*, No. W2013-01504-COA-R9-CV, 2014 WL 2155345, at *3 n.5 (Tenn. Ct. App. Apr. 22, 2014) (citing TENN. R. APP. P. 27(c)). We, therefore, consider this issue waived.

## Substantive Due Process

The Fishermen next argue that the three challenged proclamations violate substantive due process. Unless it burdens a fundamental right, a legislative act[17] "will withstand a substantive due process challenge if the government identifies a legitimate governmental interest that the legislative body could rationally conclude was served by the legislative act." *Parks Props. v. Maury Cnty.*, 70 S.W.3d 735, 744 (Tenn. Ct. App. 2001). The Fishermen do not assert that there is a fundamental right implicated in this case. Thus, the proclamations need only satisfy the rational basis test. *See Vandergriff v. City of Chattanooga*, 44 F. Supp. 2d 927, 939 (E.D. Tenn. 1998).

The plaintiffs emphasize that, pursuant to Tenn. Code Ann. § 70-4-107(c)(1), the TWRC shall determine whether "the supply of game or fish, or both, is at any time adequate to allow the taking of game or fish without the danger of extinction or undue depletion . . . after a complete survey of the area in question." According to the plaintiffs, the TWRC did not conduct such a survey to justify its actions with respect to the proclamations at issue. The Fisherman argue, in particular, that Proclamation 08-16, which removed all season and size limits on commercial fishing of paddlefish, was not supported by survey data. The defendants point out that Proclamation 08-16 was not included in the Fishermen's substantive due process claims in their amended pleading and should, therefore, be considered waived.[18] Moreover, Proclamation 08-16, which was enacted on October 7, 2008, did not take effect until November 8, 2008; Proclamation 08-18, which reinstated season and size limits on paddlefish, took effect on November 28, 2008. Thus, Proclamation 08-16 was in effect for less than one month and is now moot. We need not consider it.

The Fishermen again lean on their theory that the defendants should not be able to rely upon actions taken by or information used by the TWRA in assessing the decisions made by the TWRC. We reject this reasoning. As supported by the testimony at the hearing, the TWRA exists, in part, to conduct studies for and make recommendations to the TWRC. *See* Tenn. Code Ann. §§ 70-1-302, 70-1-206. Each time the TWRC meets, there are two days of meetings, one for committee meetings, and one for the commission meeting. The TWRA provides commission members with notebooks containing background information. Prior to the passage of most proclamations, there are months of meetings with the public, including some commission meetings. In the case of

---

[17] Legislative acts include "statutes, ordinances, and broad administrative regulations, [which] apply to large segments of society; while non-legislative or executive acts typically apply to one person or a limited number of persons." *Parks Props. v. Maury Cnty.*, 70 S.W.3d 735, 744 (Tenn. Ct. App. 2001). Substantive due process applies to both legislative and non-legislative acts. *Id.*

[18] The Fishermen did not move to conform the pleadings to the proof at trial.

Proclamation 08-01, the main one at issue here, the TWRC members were given information about the Bettoli study.

Despite the testimony of TWRA representatives about the basis for its recommendations, the Fishermen assert that there is no proof that the scientific data was "actually provided to the TWRC or served as the basis for the TWRC's proclamations." Under the rational basis analysis "if any reasonable justification for the law may be conceived, it must be upheld by the courts." *Riggs v. Burson*, 941 S.W.2d 44, 48 (Tenn. 1997). Moreover, "'the burden is on [the plaintiff] to show that there is no rational connection between the enactment and a legitimate government interest.'" *Shoemaker v. City of Howell*, 795 F.3d 553, 567 (6th Cir. 2015) (quoting *Sheffield v. City of Fort Thomas*, 620 F.3d 596, 613 (6th Cir. 2010)).

The plaintiffs proceed to make several more specific arguments concerning Proclamation 08-01. They assert that there was no rational basis for the closure of Watts Bar. There is, however, testimony in the record that the closure of Watts Bar is rationally related to public health and safety concerns. Commissioner Parks testified that Watts Bar was closed to commercial fishing due to studies performed by TDEC finding contaminants in certain fish in Watts Bar. Commissioner Chase also testified that his recollection was that Watts Bar was closed to commercial fishing due to contaminant findings and a new TWRA harvest reporting system showing that the commercial harvest of catfish on Watts Bar was more substantial than predicted. Mr. Scholten, former TWRA fisheries biologist and co-author of the Bettoli report, testified that the agency recommended the closure of Watts Bar due to TDEC's contaminant warning for catfish and TWRA's new harvest reporting system showing a higher than expected contaminated commercial catch of catfish.

Contrary to the Fishermen's assertion, the TWRC's closing of Watts Bar to commercial fishing while permitting recreational or subsistence fishing to continue is supported by a rational basis. Commissioner Chase and Mr. Denton, TDEC's environmental manager, both testified that TDEC posts signs at every ramp or public access point for recreational fishermen at affected waters in Tennessee warning of increased health risks from consuming fish. Thus, recreational and subsistence fishermen who fish in waters with contaminated fish are able to assess the risk and decide whether they want to expose themselves and their families to that risk. Those who eat fish caught by commercial fishermen do not have the same opportunity. Thus, TWRC has a legitimate reason for enacting a proclamation applicable to commercial fisherman in order to protect the general public.

The plaintiffs also challenge the basis for the proclamation's change in authorized commercial fishing gear. Specifically, the Fishermen object to the proclamation's limit on the use of fyke nets on certain reservoirs and the redefinition of fish seine. The testimony of Commissioner Chase was that he voted for the prohibition on the use of

fyke nets because they were being used in an illegal manner—i.e., as entanglement gear—thereby catching more types of fish than intended. He stated that the TWRA had provided the commission with examples of the various types of nets. Mr. Scholten gave similar testimony, explaining that entanglement gear can contribute to the depletion of a species. As to the definition of fish seine, he stated that the former definition was considered by the TWRA to be vague so the definition was clarified in order to make it legal for commercial fishermen to use a fish seine to capture bait, as they desired to do. Similar restrictions on fishing equipment have been upheld in other jurisdictions. *See Burns Harbor*, 800 F. Supp. at 733 (finding that statute banning gill net fishing was "rationally related to the legitimate goal of conserving salmon and trout"); *Cal. Gillnetters Ass'n v. Dep't of Fish & Game*, 46 Cal. Rptr. 2d 338, 344 (Cal. Ct. App. 1995) (finding that statute banning the use of gill nets along a portion of the California coastline bore a rational relationship to preserving marine resources).

Finally, the Fishermen argue that Proclamation 08-01 violated substantive due process by changing the allowable paddlefish size. The proclamation increased the minimum allowable size ("eye to fork length") of paddlefish that fishermen could harvest, gradually increasing the size beginning in 2008. As the defendants rightly point out, Proclamation 08-18, which took effect in November 2008, reduced the minimum size limit to thirty-six inches and deleted the graduated increases in subsequent years. Moreover, the plaintiffs' brief focuses upon alleged problems with the Bettoli report, based chiefly upon the testimony of the plaintiffs' expert, Dr. Kenchington. Both parties put on expert proof, and it was up to the trial court to assess the credibility of the experts and the weight to give their testimony. *See Hinson v. Wal-Mart Stores, Inc.*, 654 S.W.2d 675, 676-77 (Tenn. 1983). As Mr. Scholten testified, paddlefish are a species of "special concern" under federal regulations. The Bettoli report presented the TWRC with scientific data regarding the state of the paddlefish population in Kentucky Lake. We agree with the trial court that "[t]he TWRC had detailed plausible information that raised its concerns about the depletion of paddlefish in Tennessee."

Although the plaintiffs attempt to poke holes in the reasoning employed by the defendants, the rational basis test is met "if any reasonable justification for the law may be conceived." *Riggs*, 941 S.W.2d at 48. We find no error in the trial court's conclusion that the proclamations at issue are supported by a rational basis and do not violate substantive due process.

Conflict of Interest

The Fishermen's final argument is that the trial court erred in failing to find that Proclamation 08-01 was void *ab initio* because of the bias of Commissioner Chase. Without Commissioner Chase's vote in favor of the proclamation, they argue, it would not have passed because the vote was five to four.

The Fishermen assert that Commissioner Chase was biased because he did not base his vote on the closure of Watts Bar on information received at the TWRC meeting about the risk of fish depletion but upon what he had heard in the community and articles he had read; and because he would not change his mind no matter what information was presented to him. The plaintiffs called Commissioner Chase as a hostile witness and asked him multiple questions designed to get him to admit that he had an improper conflict of interest:

> Q. Whether or not there was a lack of scientific evidence to indicate that paddlefish were contaminated on Watts Bar was just a technicality to you, wasn't it?
> A. No, sir.
> Q. You had been so biased by things that you had heard in the community or read about regarding alleged contaminants at Watts Bar that no amount of proof or information would change your mind, would it?
> A. Probably not.
> Q. Okay. So in fact, no amount of proof would affect how you felt with respect to the closing of Watts Bar?
> A. I can't say that. To my recollection, there was no proof by the other individuals or the commercial fishermen to be considered to offset what was put in front of us.
> Q. All right. Well, my question to you, sir, is, do you agree that you had been so biased by things that you had heard in the community and things you have read outside of the commission hearings regarding alleged contamination at Watts Bar that no amount of proof presented at any commission hearing would alter your opinion?
> A. No, sir.
> Q. You agree that rank hearsay from outside the meetings was more preferable to you than any data presented at any meeting at the commission?
> A. Would you say that again.
> Q. You'll agree with me that hearsay and information you heard outside a commission meeting was more important in your considerations with respect to Watts Bar than anything that was presented in the meetings?
> A. No, sir.
> Q. It's fair to say that your conscience would not allow you to open Watts Bar to commercial fishing for paddlefish no matter where the technical and scientific data was; isn't that true?
> A. No, sir.

The overall import of this testimony does not support the Fishermen's hypothesis that Commissioner Chase was close-minded or based his decision concerning Watts Bar entirely upon what he had heard in the community.

In an attempt to counteract Commissioner Chase's courtroom statements, the plaintiffs played a portion of a recording of the September 17-18 TWRC meetings at which Proclamation 08-16 was under consideration. There was a proposed amendment to reopen Watts Bar. As chairman of the fishing committee, Commissioner Chase made a statement in opposition to the proposed amendment:

> I remember the reason in January and all the discussions that we had why we voted to discontinue commercial fishermen fishing Watts Bar Lake. And the major cause was different forms of pollution and the effect that it had on the various species of fish in the lake. And, you know, as I remember, and I think it was almost a unanimous vote that we close the body of water.
>
> Having lived in that area, familiar with the Clinch River, which is where the nuclear bomb was built in the 40s and 50s and 60s, and knowing and reading of all the different contaminants that are in that lake, river, and the Emory River, and they run down into the Tennessee River—I mean, I have read articles where somewhere between seven and ten, I believe it's, million pounds of mercury are missing from Oak Ridge that went into the ground. And I have heard all the stories about the different children and people at Kingston Hospital with different diseases and the effects that it had on these people down there. I also know that currently the federal government is spending billions of dollars in the Oak Ridge area on clean-up of contamination.
>
> I don't see how I could vote—change my vote on this issue because of a technicality in a lawsuit where a specific species of fish was not mentioned. I don't know, I recall three or four months ago a commissioner, I thought, made a great statement when he said, on a subject that had nothing to do with fishing, that the governor appointed him to this commission to represent the hunters and fishermen, sportsmen, sportswomen of the state of Tennessee, and he felt obligated to do that. I take it a step further in that I also think the governor appointed us up here to represent all the people of Tennessee for their health and safety and all the people of the surrounding states or anywhere that anything that comes out of Watts Bar can contaminate.
>
> I will just—I would much rather a judge and a jury become responsible and let me off the hook conscience-wise. And if the lawsuit goes that far, then let them decide what's good and what's bad for the people of this state. I think I could talk on this for hours, but there's been so much said about it, I have said my final peace, and I am expressing that I am not going to support this proclamation.

The defendants recalled Commissioner Chase as a witness during their case-in-chief. He testified that he based his vote, in part, on information contained in the Bettoli

- 26 -

report or Dr. Bettoli's presentations to the commission. When asked why he voted as he did regarding the closure of Watts Bar, Commissioner Chase answered succinctly: "[t]he pollutants in the lake." He added that he considered "the amount of commercial fish that was going out into the public." Commissioner Chase stated that he was an avid fisherman and that he fished Watts Bar and other waters in East Tennessee. According to Commissioner Chase, at "about every ramp, every public ramp in the Watts Bar area, there is a warning sign up about the contaminants in the fish."

The Fishermen have failed to establish an impermissible conflict of interest. Both parties rely upon *Tennessee Cable Television Association v. Tennessee Public Service Commission*, 844 S.W.2d 151 (Tenn. Ct. App. 1992), a case interpreting Tenn. Code Ann. § 4-5-302, which applies to contested case hearings under the UAPA. Because proclamations are exempted from the UAPA pursuant to Tenn. Code Ann. § 4-5-106(d), these conflict of interest provisions are not directly applicable here. We agree with the parties, however, that the principles in *Tennessee Cable* are instructive. The court in *Tennessee Cable* drew a distinction between an agency member's role in adjudicatory proceedings and rulemaking proceedings. *Tenn. Cable*, 844 S.W.2d at 164. When performing adjudicatory functions, an agency member must "abide by the same disqualification standards that are applicable to judges." *Id.* at 164-65 (citing Tenn. Code Ann. § 4-5-302(a)). Thus, "an agency member is subject to disqualification if his or her 'impartiality might reasonably be questioned.'" *Id.* at 165 (quoting TENN. SUP. CT. R. 10, Canon 3C(1)).

With respect to rulemaking, which is analogous to enacting proclamations, the court set forth a different set of governing principles:

> Rulemaking is a type of proceeding where an agency member's policy biases gained from experience and expertise become an integral part of the process. Accordingly, bias in the form of a crystallized point of view about issues of law or policy is rarely, if ever, sufficient to require an agency member's disqualification from a rulemaking proceeding. The test for determining whether an agency member should be disqualified from a rulemaking proceeding on the ground of prejudgment is whether the agency member "has an unalterably closed mind on matters critical to the disposition of the proceeding."

*Id.* (citations omitted). The court went on to state that, in light of the "constitutionally-mandated deference to an administrative agency's legislative prerogatives," those seeking to disqualify an agency member must support their motion by clear and convincing evidence. *Id.*

We agree with the trial court that the Fishermen failed to establish that Commissioner Chase had an impermissible conflict of interest. Contrary to their

argument, there is no prohibition on a commissioner being influenced by his own biases and information gathered from outside the meeting. *See id.* at 165. Moreover, clear and convincing evidence does not establish that Commissioner Chase had an "unalterably closed mind." He denied this assertion, and his statement from the September 2008 meeting shows that he believed the evidence supported his prior vote, and he decided not to support the amendment.

CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellants, Tennessee Commercial Roe Fishermen's Association and Tennessee Commercial Fishermen's Association. Execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE